UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cr-30002-MGM |
| | ) | |
| FREDERICK H. BAKER, | ) | |
| | ) | |
| Defendant | ) | |

MEMORANDUM AND ORDER ON MOTION OF DEFENDANT FREDERICK
BAKER TO COMPEL PRODUCTION OF MANDATORY DISCOVERY
MATERIALS BY THE GOVERNMENT
(Dkt. No. 22)

ROBERTSON, M.J.

I.    INTRODUCTION

Before the court in this criminal case is a motion by defendant Frederick H. Baker

("Defendant") to compel the production of discovery (Dkt. No. 22).  The government

opposes the motion (Dkt. No. 28).  The court held a hearing on Defendant's motion on

September 2, 2015.  For the following reasons, and as more fully set forth below, the court

grants in part and denies in part Defendant's motion.

II.    RELEVANT BACKGROUND

a.    Summary of factual allegations

On February 5, 2015, the government filed an information ("the Information")

charging Defendant, in Count One, with conspiring with others to violate the Clean Air

Act, 42 U.S.C. § 7413(c)(2)(C) ("the Act") by knowingly and willfully falsifying,

tampering with, and rendering inaccurate a monitoring device and method required to be

maintained by Defendant's employer, the Berkshire Power Plant, and in Counts Two

through Four with tampering with a monitoring device and method required to be

1

maintained under the Act (Dkt. No. 1 at 9-12).  According to the Information, Defendant

was the operations and maintenance manager at Berkshire Power Plant ("the Plant"), a

natural gas-fired power plant located in Agawam.  Among other things, Defendant was

responsible for overseeing Plant operators and the instrumental control and environmental

compliance technician, whose responsibilities included calibration and maintenance of the

Plant's continuous emissions monitoring system ("CEMS").  In summary, the Information

alleges that Defendant, at the direction of the Plant's general manager (now deceased) and

over a period of years, directed employees to tamper with the CEMS to save money, delay

repairs, and avoid reporting to federal and state regulators that the Plant, at times, was

releasing certain pollutants in excess of the hourly legal limits established by the Plant's

operating permit (*id.* at 1-2).

> b.  Procedural posture

On January 15, 2015, before the Information was filed, Defendant signed a plea

agreement ("the Agreement") which provided that, at the earliest practicable date,

Defendant would waive indictment and plead guilty to the Information (Dkt. No. 2).  In

signing the Agreement, Defendant acknowledged that he understood the crimes to which

he was agreeing to plead guilty; the maximum penalties for those crimes; and the penalties

potentially applicable under the United States Sentencing Guidelines ("U.S.S.Gs." or

"U.S.S.G.").  He further acknowledged that he was entering into the Agreement "freely,

voluntarily, and knowingly because [he was] guilty of the offenses to which [he was]

pleading guilty, and [he] believe[d] this Agreement [wa]s in [his] best interest" (*id.* at 8).

On February 10, 2015, the court scheduled a March 16, 2015 hearing (subsequently

rescheduled to March 24, 2015) for Defendant's waiver of indictment and plea to

2

information before District Judge Mark G. Mastroianni (Dkt. Nos. 3, 6).  On March 19,

2015, Defendant filed an emergency motion to convert the waiver of indictment and plea

hearing into a discovery conference (Dkt. No. 8).  Judge Mastroianni canceled the plea

hearing and referred the case to the undersigned for a discovery conference, following

which Defendant filed his motion to compel discovery; the government filed its opposition

thereto; and the court heard argument from the parties.

III.    DISCUSSION

a.  Discovery in connection with a guilty plea

Defendant's primary contention is that the government must produce all so-called

*Brady* material in advance of his guilty plea and that it has failed and refused to do so

(Dkt. No. 23 at 2-4).  In the memorandum in support of Defendant's motion, he has

identified a lengthy list of documents and information, all of which, he contends, is *Brady*

material that the government must produce in advance of his plea (*id*. at 14-32).  "Before

making rulings on the individual requests contained in the [m]otion, some preliminary

remarks are [appropriate] to establish the discovery landscape."  *United States v. Geas*,

No. 08-CR-30029-MAP, 2009 WL 4430100, at *1 (D. Mass. Nov. 30, 2009).

Under *Brady v. Maryland*, 373 U.S. 83 (1963), a criminal defendant is entitled to

the production by the government of exculpatory evidence that is material to guilt or

punishment.  *See, e.g., United States v. Bulger*, 928 F. Supp. 2d 305, 324 (D. Mass. 2013).

Evidence is considered "material if its disclosure has a 'reasonable probability' of

affecting the outcome at trial."  *Id.* (quoting *United States v. Aviles-Colon*, 526 F.3d 1, 20

(1st Cir. 2008)).  "The animating principle of *Brady* is the 'avoidance of an unfair trial.'"

*United States v. Mathur*, 624 F.3d 498, 506-07 (1st Cir. 2010) (quoting *Brady*, 373 U.S. at

87).   Accordingly, notwithstanding *Brady*, the United States Supreme Court has held that

"the Constitution does not require the Government to disclose material impeachment

evidence prior to entering into a plea agreement with a criminal defendant."   *United States*

*v. Ruiz*, 536 U.S. 622, 633 (2002).   Nor does the Constitution require the government to

produce information in advance of a plea regarding any "affirmative defense" a defendant

might raise at trial.   *Id.*   This is so because:

> the need for this information is more closely related to the *fairness* of a trial than
> to the *voluntariness* of the plea; the value in terms of the defendant's added
> awareness of relevant circumstances is ordinarily limited; yet the added burden
> imposed upon the Government by requiring its provision well in advance of trial
> (often before trial preparation begins) can be serious, thereby significantly
> interfering with the administration of the plea-bargaining process.

*Id.* (emphasis in original).

In *Ruiz*, the Supreme Court acknowledged that to be voluntary, a plea must be

knowing, intelligent and sufficiently aware, and that the more information a defendant has,

the more informed will be his plea decision.   *See id.* at 629.   "To date, [however,] the

Supreme Court has not addressed the question of whether the *Brady* right to *exculpatory*

material, in contrast to *impeachment* information might be extended to the guilty plea

context[,]" *United States v. Moussaoui*, 591 F.3d 263, 286 (4th Cir. 2010) (emphasis in

original), and there is a split among the circuits on this point.   *See and compare United*

*States v. Conroy*, 567 F.3d 174, 179 (5th Cir. 2009) (*Brady* does not require that

exculpatory information be turned over before entry of a plea); *McCann v. Mangialardi*,

337 F.3d 782, 787-88 (7th Cir. 2003) (*Ruiz* implies that *Brady*-type disclosures of

exculpatory evidence might be required before a plea).   The First Circuit has not ruled on

this issue, although it has stated, in the context of a defendant's collateral attack on his

conviction, that "*Brady* does not protect against the possible prejudice that may ensue

4

from the loss of an opportunity to plea-bargain with complete knowledge of all relevant facts.  That makes good sense: when a defendant chooses to admit his guilt, *Brady* concerns subside." *Mathur*, 624 F.3d at 507.  It bears noting that the Supreme Court has rejected the notion that "whenever a defendant alleges that [undisclosed] evidence might be material, the appropriate method of assessing this claim is to grant full access to the disputed information[.]" *Pennsylvania v. Ritchie*, 480 U.S. 39, 9 (1987).  "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *see United States v. Tsarnaev*, Criminal Action No 13-10200-GAO, 2013 WL 6196279, at *2 (D. Mass. Nov. 27, 2013).  "'The government is primarily responsible for deciding what evidence it must disclose to the defendant under *Brady*.'" *Tsarnaev*, 2013 WL 6196279, at *2 (quoting *United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011)).  Further, the First Circuit has held that evidence that is cumulative of other exculpatory evidence that has been disclosed generally is not material for purposes of *Brady*.  *See United States v. Paladin*, 748 F.3d 438, 446 (1st Cir. 2014) (citing *Aviles-Colon*, 536 F.3d at 19; *Moreno-Morales v. United States*, 334 F.3d 140, 148 (1st Cir. 2003)).  Finally, "if the defendant knows of the specific exculpatory information, *Brady* does not require disclosure." *United States v. Clark*, 767 F. Supp. 2d 12, 52 (D.D.C. 2011).

"[E]vidence is exculpatory only by reference to issues placed in dispute by substantive criminal law definitions of the offenses charged[.]" *United State v. LaRouche Campaign*, 695 F. Supp. 1290, 1296 (D. Mass. 1988).  Defendant is charged with conspiring to violate the Act by *knowingly* and *willfully* falsifying, tampering and rendering inaccurate a monitoring device and method required to be maintained under the

Act.  Defendant acknowledges *knowing* about three types of adjustments that were made

to the Plant's CEMS in different time frames.  The Information alleges that, beginning in

or around at least October 2008 and continuing through in or about the spring of 2010, the

Plant's general manager instructed Defendant to direct the instrumental control and

environmental compliance technician to make adjustments to the CEMS oxygen and the

nitrogen oxides monitor.  Defendant denies knowing that these adjustments were illegal.

At the September 2, 2015 hearing, the government represented that (while it had its

suspicions), it would not argue at sentencing that Defendant caused these adjustments to

be made *willfully* (in other words, with knowledge of their illegality).  From in or around

May 2010 and continuing through in or about March 2011, Defendant directed staff

members at the Plant to make additional adjustments to the CEMS monitors.  The

government contends that Defendant gave these directions with knowledge of their

illegality; Defendant contends otherwise (Dkt. No. 1 at 10; Dkt. No. 23 at 6).  Finally,

according to the Information, in or around late 2010 through March 2011, at the direction

of Defendant and the Plant's general manager, staff members at the Plant made additional

mid-shift adjustments to the CEMS monitors "to disguise the fact that the plant was

releasing emissions at warning levels and beyond its hourly permit limits" (Dkt. No. 1 at

10).  Defendant acknowledges knowing that some adjustments made at the very end of his

employment at the Plant were illegal (Dkt. No. 23 at 6).  Defendant claims that the

additional discovery he seeks from the government is material to the question of whether

he acted with knowledge of illegality as to certain adjustments made from in or around

May 2010 through March 2011, and that this question of willfulness, or knowledge of

illegality, could affect the punishment imposed on him by the District Judge.

Assuming that Defendant has a right to exculpatory information in advance of his guilty plea, there are questions (in addition to materiality) about whether certain disclosures are required to be made prior to a plea to information and the form in which the government is required to disclose exculpatory information.  Defendant contends that, before any Rule 11 hearing in this case, he is entitled to the disclosures mandated by Local Rule 116.2(b)(1)-(3), *and* the "written summary of any information in the government's possession that tends to diminish the degree of the defendant's culpability or the defendant's Offense Level under the United States Sentencing Guidelines" mandated by Local Rule 116.2(b)(4) (Dkt. No. 23 at 2-4).  For its part, the Government contends that its obligations in advance of an early plea are limited to those set forth in Local Rule 116.2(b)(4).

In the court's view, the government has the better argument.  The disclosure obligations set forth in Local Rule 116.2(b)(1)(C)-(E) concern impeachment evidence which, under *Ruiz*, the government is not obligated to produce prior to a plea.  The disclosure obligations in Local Rule 116.2(b)(2) and (3) are triggered by dates set for trial proceedings, and by their terms, do not apply when, as in this case, a defendant signs an agreement to plead guilty that is filed with the court concurrently with an information. Further, much of the material referred to in Local Rule 116.2(b)(2) and (3) is impeachment material that the government is not required to produce in advance of a plea. Finally, as the government points out, Local Rule 116.1(c)(1) and (2) list the categories of information the government is automatically required to disclose to a criminal defendant following arraignment, *including exculpatory information*.  *See* Local Rule 116.1(c)(2).

7

By its terms, Rule 116.1(c)(1) does not apply in the case of a Rule 11 arraignment on an information. Because Local Rule 116.2(b)(4) directly addresses the scope of the government's obligations to disclose *Brady*-type information in advance of a plea, the court concludes that the government's obligations with respect to the disclosure of exculpatory material in advance of plea generally are governed and limited by the provisions of Local Rule 116.2(b)(4).

  b. <u>Statement pursuant to Local Rule 116.2(b)(4)</u>

  Defendant complains that, in response to his request for the written summary of information in the government's possession required under Local Rule 116.2(b)(4), the government replied, by email and in summary, that it was not aware of any information that tended to diminish Defendant's degree of guilt or his offense level under the U.S.S.Gs. beyond what was stated in the Information and had already been provided to Defendant in discovery (Dkt. No. 28 at 2-3). Defendant contends that this response does not satisfy the requirements of Local Rule 116.2(b)(4). Here, in the court's view, Defendant has the more persuasive argument. Neither party has pointed to any legal authority defining the government's obligations under Local Rule 116.2(b)(4), nor has the court found any. Generally, however, a summary is a concise statement that gives the most important information, or main points, about the topic at hand. *See* Merriam-Webster.http://www. Merriam-webster.com/dictionary (last visited Nov. 23, 2015). The court concludes that Defendant is entitled, under Local Rule 116.2(b)(4), to a separate written statement from the government that sets forth, in summary terms, the material information in its possession, custody or control that could be relevant to diminishing the degree of Defendant's culpability or his offense level under the U.S.S.Gs., even if any

such written summary appears duplicative of some of the contents of the Information and of material that has been turned over to Defendant in discovery.

      c.  <u>Defendant's specific requests</u>

By Defendant's motion, he seeks to compel production by the government of: (1) "debriefings" of Plant managers, operators, two outside experts on the Plant's CEMS system; and other potential witnesses; (2) job descriptions for the Plant's general manager, plant managers, and the instrumental control and environmental compliance technician, and Defendant's performance appraisals; (3) the "provenance," history of, and metadata for, two reports that the government has produced; (4) two emails Defendant thinks he sent, one being an email to Plant employees that accompanied a manual instructing operators on how to make CEMS adjustments, and the other being an email to a plant manager about the qualifications of the instrumental control and environmental compliance technician; (5) any and all information in the government's possession about mid-shift adjustments made after a May 18, 2010 "de-loading" incident at the Plant; (6) January-March 2011 emails about CEMS adjustments made at the plant; (7) notes that may have been made by plant manager Kevin Hagerty for his successor; and (8) any information in the government's possession indicating that the actual environmental harm resulting from the CEMS adjustments was "minimal, or lower than the government contends" (Dkt. No. 23 at 27).  The court addresses each of these categories of information below.[1]  *See Landron-Class*, 714 F. Supp. 2d 278, 281-83 (D.P.R. 2010)

---

[1] At the September 2, 2015 hearing, defense counsel argued that the materiality of the information Defendant is seeking should be judged by viewing the information collectively because, while on an item by item basis, the information might not appear material, taken together it would present a picture for the sentencing judge supporting Defendant's argument that he lacked knowledge of the illegality of many of the CEMS

(considering on an item-by-item basis information defendant sought from government); *Geas*, 2009 WL 4430100, at *2-3 (same).

1. So-called "debriefings"

Defendant does not contend that the Government has failed to turn over to him copies of witness statements, as such statements are defined for discovery purposes by the Jencks Act, 18 U.S.C. § 3500(e). Informal notes of witness interviews that do not meet Jencks Act guidelines are non-discoverable. *See United States v. Sepulveda*, 15 F.3d 1161, 1179 (1st Cir. 1993); *United States v. Melo*, 411 F. Supp. 2d 17, 21 (D. Mass. 2006). At the September 2, 2015 hearing, the government acknowledged its obligation, not to provide Defendant with copies of "debriefing" notes, but, if these so-called debriefings produced exculpatory information to which Defendant was entitled under *Brady*, to inform Defendant about any such information. The government represents that it has met this obligation. "[The court] accepts that representation in the absence of any specific indication to the contrary." *Tsarnaev*, 2013 WL 6196279, at *5; *see also Melo,* 411 F. Supp. 2d at 18 (information reflected in informal witness notes may be required to be produced if exculpatory). Exculpatory information, if any, that the government acquired

---

adjustments that were made at the Plant. There is a basis for Defendant's argument that *Brady* materiality should be determined "collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That argument, however, presupposes that the information requested is discoverable, both generally and at this stage of the proceedings. Some of the information Defendant has requested is not discoverable at all or is not discoverable in the form in which Defendant has requested it, at least at this point in the proceedings, and some is already known to Defendant. Moreover, while Defendant has broken down his requests for information into discrete items or categories, taken together, the requests amount to a demand to conduct an in-depth review of the government's file in this case. The requests, viewed in their totality, essentially turn *Brady* on its head. *See Tsarnaev*, 2013 WL 6196279, at *2 (defendant's request for broad access to information in government's possession "turn[ed] the *Brady* doctrine on its head; defense counsel has no constitutional right to conduct his own search of the government's files); *see also Ritchie*, 480 U.S. at 59-60.

during these so-called debriefings should be included in its separate Local Rule
116.2(b)(4) written summary.  Defendant's request for copies of so-called debriefing
notes, however, is denied.

### 2.   Job descriptions and performance appraisals

The Information acknowledges that Defendant frequently acted at the direction of
the Plant's general manager (Dkt. No. 1 at 1, 3, 4), and the Agreement acknowledges that
he was a manager or supervisor and not an organizer or leader in the scheme that is the
basis of the allegations in the Information (Dkt. No. 2 at 2).  That the government's
acknowledgment about Defendant's role in the scheme is reflected in the Information and
the Agreement does not make these documents a substitute for a separate written summary
of exculpatory information from the government.  Accordingly, potentially exculpatory
information about Defendant's position in the hierarchy at the Plant should be reflected in
the government's separate Local Rule 116.2(b)(4) written summary.

To the extent Defendant's performance appraisals show that he was a good
performer, that fact would not excuse and is not material to charges that, with others, he
violated the Act.[2]  That the job descriptions of the general manager, the plant managers,
the instrumental control and environmental technician, and the plant operators might show
that others in addition to Defendant had environmental responsibilities at the Plant, does
not make this information material because it also would not excuse or mitigate

---

[2] Defendant should be able to obtain copies of his performance appraisals from his former
employer pursuant to Section 52C of Chapter 149 of the Massachusetts General Laws.
That these documents were – and may still be – available from another source provides
further support for the conclusion that the government had no obligation to obtain and
produce them.  *See, e.g., United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) (when
purportedly exculpatory evidence lies in a source where a reasonable defendant would
have looked, defendant not entitled to benefit of *Brady*).

Defendant's criminal conduct. This conclusion is not altered by Defendant's representation that some of these individuals are not being prosecuted. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). These documents, moreover, would be cumulative of representations by the government about Defendant's position in the Plant's chain of command, other information the government has already produced, and information known to Defendant. *See Landron-Class*, 714 F. Supp. 2d at 283 (denying motion to compel where government's proffer appeared to cover information defendant sought in requesting informant's tax returns). The government is not required to produce job descriptions for Plant employees or copies of Defendant's performance appraisals.

       3.   Information, including metadata, concerning produced reports

      Defendant acknowledges that the Government has produced two reports or documents, one apparently captioned the "Reg Perfect Calibration Report," and the other referred to by Defendant as the "CEMS Calibration Action Levels Document." Defendant is already in a position to rely on the contents of these document sto the extent he deems those contents exculpatory. He seeks information bearing on their authorship and distribution. The government represents that metadata and other information bearing on the creation of the reports, to the extent it exists, is not exculpatory (Dkt. No. 28 at 12). Unless a defendant has very specific information calling such an assertion into question, which is not the case here, "the prosecutor's decision on disclosure is final." *Tsarnaev*, 2013 WL 6196279, at *2. Nor does it appear that this information would meet the *Brady*

materiality test.  The government has already provided Defendant with information about other Plant employees' knowledge of the adjustments, and should summarize such information in its Local Rule 116.2(b)(4) written summary to the extent it is exculpatory. There does not appear to be a reasonable probability that disclosure of information about the creation of these reports would result in a difference in the outcome of these proceedings.  *See, e.g., Prochilo*, 629 F.3d at 268; *Landron-Class*, 714 F. Supp. 2d at 281. The government is not required to produce metadata or other information about these two reports.

### 4.  Defendant's emails

The government has produced a copy of a CEMS manual prepared by Defendant and the instrumental control and environmental compliance technician.  It is not clear whether the government has already produced to Defendant a copy of a cover email Defendant apparently composed and sent to other Plant employees with copies of the CEMS manual (Dkt. No. 23 at 23; Dkt. No. 28 at 11).  If such a document exists and has not already been provided, it should be produced to Defendant.  Defendant's email describing the qualifications of the instrumental control and environmental compliance technician is similar to the job descriptions of other employees.  It does not meet the *Brady* test of materiality.  Moreover, Defendant is aware of the qualifications of this employee and the extent to which he relied on the technician's expertise in directing or approving CEMS adjustments.  The government is not required to produce information that is not material and is already known to Defendant.

### 5.  Information about CEMS adjustments instituted after May 18, 2010

Defendant's request for any and all information in the government's possession about CEMS adjustments instituted after May 18, 2010 "is not specific and targeted but rather broad and categorical," *Tsarnaev*, 2013 WL 6196279, at *2. To the extent Defendant has identified specific items related to a practice of CEMS adjustments introduced as a result of a May 18, 2010 de-loading incident, his request for information appears well-founded. The government should produce to Defendant, if it exists, any May 2010 emails the general manager sent out in connection with the incident and Plant emissions (Dkt. No. 23 at 24). As to metadata for any such email, the government represents that, to the extent it exists, it is not exculpatory. The government's decision on this point is not subject to second-guessing on the basis of this record (Dkt. No. 28 at 12). *See Ritchie*, 480 U.S. at 59; *Tsarnaev*, 2013 WL 6196279, at *5. Defendant's request for the metadata about this email, to the extent such metadata exists, is denied.

To the extent the government has other information in its possession, including information that it has not produced, that might show that Defendant did not know that CEMS adjustments introduced after May 18, 2010 were illegal, including information that the new adjustments were widely publicized, that other employees believed that the adjustments were legal, or accepted the adjustments without question, any such information should be included in the government's Rule 116.2(b)(4) written summary.

6. January-March 2011 emails about CEMS adjustments

Defendant acknowledges knowing that some CEMS adjustments made in this timeframe were illegal, and that the government has produced "a handful" of emails in which Plant operators communicated about these adjustments with Defendant, the Plant manager, and the instrumental control and environmental compliance technician. He

14

demands production of any and all such emails showing that these admittedly illegal CEMS adjustments were made with the knowledge of Defendant's supervisor and others (Dkt. No. 23 at 25). Such information, if it exists, would not meet the *Brady* materiality test. *See Paladin*, 748 F.3d at 446; *Bulger*, 928 F. Supp. 2d at 324. That others knew illegal adjustments were being made would not excuse Defendant's role in knowingly and willfully participating in illegal CEMS adjustments. Further, the government represents that any such information would be cumulative of emails and information the government has already produced at this pre-plea stage, including testimony and interviews of multiple operators (Dkt. No. 28 at 12-13). *See Paladin*, 748 F.3d at 446. Accordingly, this request by Defendant for supplemental information is denied.

7. <u>Turnover notes</u>

Defendant believes that when Plant manager Kevin Hagerty was replaced by another manager, Mr. Hagerty may have made notes for his successor that described some of the illegal CEMS adjustments as legitimate (Dkt. No. 23 at 25-26). According to the government, it has already produced information about Mr. Hagerty's views of the CEMS adjustments at the Plant, including testimony given by him, presumably to the grand jury (Dkt. No. 28 at 12). To the extent Defendant seeks the notes because they may contradict information already in his possession, he is not entitled to the production of impeachment evidence. *See Ruiz*, 536 U.S. at 633. He has not otherwise explained why he needs information beyond what the government has already produced concerning Mr. Hagerty's

knowledge of, and opinions about, the CEMS adjustments.[3]  This request for supplemental information is therefore denied.

### 8. Information about environmental harm

Finally, Defendant contends that he is entitled to information in the government's possession indicating that the environmental harm caused by the illegal CEMS adjustments was "minimal or lower than the government contends," (Dkt. No. 23 at 27). The government has not admitted that it cannot prove environment harm resulting from the illegal tampering with the Plant's CEMS.  Rather, it has said that, at least at this point, it cannot trace Plant emissions that exceeded permit levels to specific environmental harms, such as, for example, an increase in problems with breathing.   The government contends that it is not obligated to produce information bearing on environmental harm because courts have ruled that the applicable U.S.S.G. "assumes actual environmental contamination if the text of § 2Q1.3(b)(1) itself is met."  *United States v. Perez*, 366 F.3d 1178, 1183 (11th Cir. 2004); *see also United States v. Strandquist*, 993 F.2d 395, 400 (4th Cir. 1993); *United States v. Panyard*, No. 07-20037-2, 2009 WL 1099257, at *5 (E.D. Mich. Apr. 23, 2009) ("[T]he Sentencing Commission clearly recognized that the terms 'discharge' and 'emission' cover a broad range of actions, which may cause harm in a number of ways, and to varying degrees."); *cf. United States v. Tuma*, 738 F.3d 681, 692-93 (5th Cir. 2013) (enhancement in U.S.S.G. § 2Q1.2(b)(1)(A), whose language parallels the language in 1Q1.3(b)(1), does not impose any requirements on its application beyond those contained in the guideline; government not required to prove actual environmental contamination for guideline to apply).

---

[3] At the April 29, 2015 discovery conference, Defendant represented that Mr. Hagerty's sworn testimony was sufficient.

As is set forth in the Agreement, U.S.S.G. § 2Q1.3(b)(1)(A) provides for a six level enhancement when, as in this case, the offenses charged resulted in a repetitive discharge, release or emission of a pollutant into the environment (Dkt. No. 2 at 2). Application Note 4 ("Note 4") to this sentencing guideline provides, however, for a lesser enhancement depending on the degree of environmental harm caused by such discharges, releases or emissions, as follows:

> Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination. A wide range of conduct involving the handling of different quantities of materials with widely differing propensities, potentially is covered. Depending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation, a departure of up to two levels in either direction from that prescribed in these specific offense characteristics may be appropriate.

*United States v. Panyard*, No. 07-20037-2, 2009 WL 1099257, at *4 (quoting § 2Q1.3 cmt. n.4).

The government – and Defendant – agreed to a five level enhancement under U.S.S.G. § 2Q1.3(b) (1)(A) and Note 4 based on the extent of the harm to the environment caused by the conduct of Defendant and others (Dkt. No. 2 at 2). According to Defendant, after he executed the Agreement, he learned that the Plant was re-permitted in 2013 by the federal and state Environmental Protection Agencies. He believes that under the 2013 permit, most of the emissions that exceeded hourly permitted levels from 2008 through 2011would not exceed the hourly permitted levels in the 2013 permit (Dkt. No. 23 at 27-28). He asserts that, notwithstanding his execution of the Agreement, he is entitled to present information to the sentencing judge that may call into question the extent of the

environmental harm caused by what he admits were violations of the permit in effect prior to 2013 (*id.* at 28*).*

Defendant agreed at the September 2, 2015 hearing that the 2013 permit – which he believes is exculpatory on the question of environmental harm and, therefore, on the question of punishment for him – is a public document that the government is not required to produce. He argues, however, that a presentation made to the government by the Plant owner to the effect that emissions under the permit in effect from 2008 to 2011 caused minimal, if any, environmental harm, is potentially exculpatory under U.S.S.G. § 2Q1.3(b)(1)(A) and Note 4 and should be produced to him. The court agrees.

There may be grounds on the basis of which the government could have argued that a presentation made by a third party during a government investigation for purposes of avoiding criminal responsibility is protected from disclosure by some form of privilege, *see Stamps v. Town of Framingham,* 38 F. Supp. 3d 134 (D. Mass. 2014), but it has not done so. The government is free to argue at sentencing that a presentation by an interested party seeking to avoid criminal liability is biased and not worthy of credence, but the court cannot conclude that such a presentation is irrelevant, and, therefore, immaterial to the question of Defendant's punishment for his role in the illegal emissions from the Plant. The presentation about environmental harm – or the lack thereof – made by the Plant owner to the government should be produced.

    d.  <u>Protective order</u>

In view of the government's representation that its investigation in this matter has not been concluded, and in consideration of the interests of third parties in confidentiality, a protective order governing the confidentiality of materials produced by the government

is warranted.  If such material is filed with the court in the course of any further hearings in this case, the question of the confidentiality of documents being filed with the court can be addressed at that time.  *See, e.g., United States v. Swartz*, 945 F. Supp. 2d 216, 220 (D. Mass. 2013) (no public right of access to discovery materials not incorporated into judicial record).  A separate protective order shall enter substantially in the form proposed by the government.

     e.  <u>Allegations of governmental malfeasance</u>

Defendant's broad accusations of malfeasance in this matter by the government are unconvincing.  This is not a case like *Ferrara v. United States*, 384 F. Supp. 2d 384 (D. Mass. 2005), where the government failed to disclose evidence directly negating the defendant's guilt for the crime of murder, or *United States v. Jones*, 620 F. Supp. 2d 163 (D. Mass. 2009), where the prosecutor failed to disclose information tending to show that the police officer who, in his testimony at trial, identified the defendant as the possessor of an illegal gun, had perjured himself.  The First Circuit observed in *Mathur* that:

> [t]he animating principle of *Brady* is the avoidance of an unfair trial. It is, therefore, universally acknowledged that the right memorialized in *Brady* is a trial right.  Consequently, courts enforce *Brady* in order to minimize the chance that an innocent person [will] be found guilty. The core question is whether, despite the suppressed evidence, the accused  received a fair trial, understood as a trial resulting in a verdict worthy of confidence.
> In urging us to extend *Brady's* prejudice component to pretrial plea negotiations, the defendant exhorts us to break new ground.  He does not cite a single case standing for this novel approach, but, rather, relies on authority extolling the importance of plea negotiations. Although we recognize that plea negotiations are important, that fact provides no support for an unprecedented expansion of *Brady.*
>
> * * *
>
> *Ruiz* teaches that *Brady* does not protect against the possible prejudice that may ensue from the loss of an opportunity to plea-bargain with

> complete knowledge of all relevant facts.  This makes good sense:
> when a defendant chooses to admit his guilt, *Brady* concerns subside.

*Mathur*, 624 F.3d at 506-507 (internal citations omitted).  Accepting Defendant's

contentions about the government's discovery obligations in a case such as this "could

require the government to devote substantially more resources to trial preparation prior to

plea bargaining, thereby depriving the plea-bargaining process of its main resource-saving

advantage." *Ruiz*, 536 U.S. at 632.  There is nothing in the record before the court to

suggest anything other than a legitimate dispute about the extent of the government's

discovery obligations in a case in which Defendant's agreement to plead guilty was filed

concurrently with the Information.

IV.    CONCLUSION

For the reasons set forth above, Defendant's motion is GRANTED in part and

DENIED in part.  Within twenty-one (21) days of the issuance of this order, the

government shall produce to Defendant: (1) a written summary in compliance with Local

Rule 116.2(b)(4) including any information in its possession that tends to diminish the

degree of Defendant's culpability or his offense level under the U.S.S.Gs.; (2) copies of

(a) an email composed by Defendant and sent to Plant employees with a CEMS

compliance manual; and (b) May 2010 email(s) from the Plant's general manager

concerning a May 18, 2010 de-loading incident, to the extent such emails exist and are in

the possession of the government; and (3) a copy of any presentation by the owner of the

Plant about the environmental harm attributable to illegal adjustments to the Plant's

CEMS.

This case is set for a Rule 11 hearing before District Judge Mark G.

Mastroianni on January 6, 2016 at 2:00 p.m.

It is so ordered.

Dated:  December 8, 2015                    /s/ Katherine A. Robertson
                                            KATHERINE A. ROBERTSON
                                            U.S. MAGISTRATE JUDGE